**SIGNED this 24 day of April, 2017.**



_____
**John T. Laney, III
United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| In re: | * | |
| ALPHA PROTECTIVE SERVICES, INC., | * | Chapter 7 |
|     Debtor, | * | Case Number: 12-70482- JTL |
| | * | |
| NEIL C. GORDON, TRUSTEE, | * | |
|     Plaintiff, | * | |
| | * | Adversary Proceeding |
| v. | * | Number: 14-07033 |
| | * | |
| SIGMUND ROGICH, | * | |
|     Defendant. | * | |

___

### MEMORANDUM OPINION

This Adversary Proceeding is before the Court on a Motion for Full or Partial Summary Judgment ("Motion") filed by the Plaintiff, the Trustee. The Court has carefully considered the pleadings and briefs, the parties' oral arguments, and the applicable statutes and case law. For the reasons set forth below, the Court will GRANT partial summary judgment for the Plaintiff.

1

**Procedural History**

This Adversary Proceeding arises out of the underlying bankruptcy case of Alpha Protective Services, Inc. (the "Debtor). On April 12, 2012, the Debtor filed for Chapter 11 bankruptcy relief (the "Petition Date"). (Petition, Lead Case ECF No. 1). On December 20, 2012, the Court converted the Debtor's Chapter 11 case to a Chapter 7 case. (Order on Conversion, Lead Case ECF No. 156). On April 1, 2014, the Trustee filed the above-captioned adversary proceeding against the Defendant, Sigmund Rogich ("Rogich"). (Compl., Adversary Proceeding ECF No. 1).[1] The Trustee filed the instant Motion on October 10, 2016. (Pl.'s Mo. for Full or Partial Summ. J., A.P. ECF No. 87). In his Motion, the Trustee seeks full or partial summary judgment on Count III of his complaint against Rogich.[2] In Count III, the Trustee seeks to avoid and recover a single payment of $100,000 made to Rogich pursuant to 11 U.S.C. § 544. On December 15, 2016, Rogich filed a Response with Opposition to the Trustee's Motion ("Response"). (Def.'s Resp. with Opp'n, A.P. ECF No. 96). On January 12, 2017, the Trustee filed a Reply Brief. (Pl.'s Reply Br., A.P. ECF No. 100). On January 13, 2017, the Court held oral argument on the Trustee's Motion and Rogich's Response.

**Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure ("Rule") 56,[3] the Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must view the evidence in the record "in the light most favorable to the non-moving party." *Jordan v. Clifton*, 74 F.3d 1087,

---

[1] The Adversary Proceeding Docket will be referred to hereinafter as "A.P."
[2] In Counts I and II, the Trustee sought to recover the payment of $100,000 made to Rogich within two years of the Debtor filing its petition. He alleged that the payment was a fraudulent transfer under 11 U.S.C. §§ 544 and 548. The Trustee amended his original complaint on October 24, 2015 to withdraw Counts I and II.
[3] Federal Rule of Civil Procedure 56 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

1090 (11th Cir. 1996). *See also Info. Sys. & Network Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (noting that the court must "resolve all reasonable doubts about the facts in [the non-moving party's] favor"). Additionally, the Court must draw "all justifiable inferences" in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Under Rule 56(c), the party seeking summary judgment bears the burden of showing the bankruptcy court the basis for its motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact" and warrant a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

An issue of fact is material if it affects the outcome of the case as identified by substantive law. *Anderson*, 477 U.S. at 248; *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996). Therefore, the court will focus its analysis solely on factual contentions that are relevant and necessary to the outcome of the case. *Id.* A genuine dispute exists if a reasonable fact finder could find in favor of the non-moving party based on the evidence. *Anderson*, 477 U.S. at 248. A genuine dispute means that "more than 'some metaphysical doubt [exists] as to the material facts.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). If the nonmoving party "bear[s] the burden of proof at trial on a dispositive issue," the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

**Factual Background**

Rogich is the president of Rogich Communications Group ("RCG"), which specializes in crisis management, public relations, and business facilitation. He has 25 years of experience in the crisis-management-communication business. Prior to starting RCG, he served in many roles in American politics, namely director of advertising for former President George H. W. Bush during the 1992 presidential election, manager of former President Ronald Reagan's advertising campaigns during the 1980 and 1984 presidential elections, and assistant to former President George H. W. Bush. In 1992, he was appointed as the United States Ambassador to Iceland, his native country. Rogich first learned of the Debtor and its business when one of his former White House employees contacted him for the purpose of acquiring financing and securing new business for the Debtor. It was around this time that Rogich also met Paul Hackenberry ("Hackenberry") in connection with the Debtor's business. After meeting what Rogich characterized as a "first class team of security professionals," he decided to work with the Debtor's CEO and at the time 51% owner, Jeffrey Brinson, to assist Brinson in obtaining financing to buy out his minority partner, James Harrison. (Rogich Aff. ¶¶ 1-7, A.P. ECF No. 98). His involvement in the operations of the Debtor consisted of assisting the Debtor in obtaining financing and securing new business. (Id. ¶ 9). This involvement eventually lead to him being named to the Debtor's board of directors. (Id.).

Beginning in February 2011, the Debtor used two Bank of America accounts; one account was its general operating account and the other was its payroll account. (Schedules & Statement of Financial Affairs, Lead Case ECF No. 48). At some point prior to the Debtor's filing of its petition, Bank of America froze the Debtor's general operating account due to a garnishment from Omniplex World Services Corporation ("Omniplex"). (Rule 2004

Examination Tr. Vol. I. 51:10-21, Lead Case Docket 654-1). The basis for the garnishment was a judgment for $1,863,221.32 entered by the United States District Court of the Middle District of Georgia on March 23, 2011. (Edwards Aff. Ex. E, A.P ECF No. 89-5). By the end of 2010, the Debtor owed the Internal Revenue Service ("IRS") $168,984.80 in Federal Insurance Contributions Act ("FICA") and withholding taxes. (Edwards Aff. Ex. C, IRS Proof of Claim, A.P. ECF No. 89-3). By March 31, 2011, the Debtor owed the IRS an additional $419,035.81 in such taxes. (Id.).

On January 25, 2011, Hackenberry advanced $110,000 to the Debtor to help the Debtor payroll for February 2011. On February 11, 2011, the Debtor repaid Hackenberry the full amount of the cash advance. (Hackenberry Dep. 63:9-13, A.P. ECF No. 79-1). On January 27, 2011, Rogich advanced $100,000 to the Debtor to help the Debtor payroll for March 2011. On March 11, 2011, the Debtor repaid Rogich the full amount of the cash advance. (Rogich Aff. ¶ 12, A.P. ECF No. 98; Rogich Dep. 44:5-6, 152:8-15, A.P. ECF No. 73).

**Discussion and Conclusions of Law**

I.     Section 544 and Applicability of the Federal Debt Collections Procedures Act

Pursuant to § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [§] 502." 11 U.S.C. § 544(b)(1) (2017). The burden is on the trustee to prove the existence of an actual creditor who holds an unsecured claim against the debtor. 5 Collier on Bankruptcy ¶ 544.06 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (*In re 9281 Shore Rd. Owners Corp.*, 187 B.R. 837, 852 (E.D.N.Y. 1995); *Bakst v. Probst (In re Amelung)*, 436 B.R. 806, 809 (Bankr. D.S.C. 2010) (citing Collier); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 18 n.30 (Bankr. D. Colo. 1993) (citing Collier)). The

5

trustee must also identify such creditor who would have had standing to sue the debtor to avoid the transfer on the date the debtor filed its bankruptcy petition. 5 Collier on Bankruptcy ¶ 544.06[1] (citing *In re Petters Co.*, 495 B.R. 887, 896–901 (Bankr. D. Minn. 2013)).  The phrase "applicable law" in § 544(b)(1) allows the trustee to utilize federal and state non-bankruptcy laws providing rights to pursue fraudulent or preferential-transfer actions. Id.

The Trustee in the instant case has identified the IRS as a creditor with an unsecured claim against the Debtor. (*See* Compl. ¶¶ 24-25, A.P. E.C.F. No. 1; IRS Proof of Claim).  The applicable non-bankruptcy law under which the Trustee is basing his claim is 28 U.S.C. § 3304(a)(2), which is a subsection of the Fair Debt Collections Procedures Act ("FDCPA").  He argues that the IRS would have had standing to bring an insider-preference claim against Rogich for the $100,000 transfer pursuant to 28 U.S.C. § 3304(a)(2), which states that

> (a) . . . a transfer made . . . by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made . . . if . . .
>
> (2)(A) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time; and
>
> (B) the insider had reasonable cause to believe that the debtor was insolvent.

28 U.S.C. § 3304(a)(2) (2017).

In *Gordon v. Harrison (In re Alpha Protective Services, Inc.)*, this Court determined that the FDCPA was applicable law under which the Trustee may avoid insider-preferential transfers made by the debtor pursuant to § 544. 531 B.R. 889, 906 (Bankr. M.D. Ga. 2015).  This Court reasoned that [t]he ordinary meaning of 'applicable law in § 544 would be *any law* that could be used by an unsecured creditor to avoid a transfer outside bankruptcy." *Id.* (emphasis in original).

Furthermore, the plain language of § 544 does not limit the Trustee's choosing of an unsecured creditor under whose rights he is bringing the action. *Id.*

This Court also addressed the applicable "reach back period" for such § 544 actions. *Id.* at 908. The FDCPA provides that claims for insider preferences under 28 U.S.C. § 3304(a)(2) "extinguish unless [the] action is brought . . . within 2 years after the transfer was made." 28 U.S.C. § 3306(b)(3) (2017). Applying that FDCPA limitation, this Court determined that the trustee may avoid insider-preferential transfers made within two years of the debtor's filing of its petition. *In re Alpha Protective Servs., Inc.*, 531 B.R. at 908-09.

In accordance with this Court's previous decision in *In re Alpha Protective Services, Inc.*, the Court finds in the instant case that the FDCPA is applicable non-bankruptcy law under § 544(b) that may be utilized by the Trustee. First, the Trustee may "step into the shoes" of the IRS because it is a holder of an unsecured claim against the Debtor for a debt owed to the United States. Second, the transfer at issue occurred on March 11, 2011, which is within the two year reach back period as provided by the FDCPA. However, the Trustee must prove the elements of 28 U.S.C. § 3304(a)(2) to avoid the transfer pursuant to § 544(b). Therefore, the Court must determine whether genuine disputes as to material facts exist regarding the elements of 28 U.S.C. § 3304(a)(2).

II.    Elements of an Insider Preference Claim under the FDCPA

To proceed under the FDCPA, the Trustee must prove the following: (1) "the transfer was made to an insider for an antecedent debt;" (2) "the debtor was insolvent at the time of the transfer;" and (3) "the insider had reasonable cause to believe that the debtor was insolvent." 28 U.S.C. § 3304(a)(2).

    a.  Insider Status

7

The FDCPA provides a "Definitions" subsection to define terms as they pertain to fraudulent transfers. 28 U.S.C. § 3301 (2017). That subsection defines an "insider" to a corporate debtor to include any of the following: "[a] director of the debtor; [an] officer of the debtor, [a] partnership in which the debtor is a general partner; [a] general partner of the debtor; or [a] relative of a general partner, director, officer, or person in control of the debtor." 28 U.S.C. § 3301(5)(B) (2017). These descriptions of insiders are also enumerated in the Bankruptcy Code to define an insider to a corporate debtor. *See generally* 11 U.S.C. § 101(31)(B) (2017).

First, the Court notes that there is no dispute that the March 11, 2011 transfer was in repayment of the cash advance of $100,000 made by Rogich on January 27, 2011. Therefore, the March 11 transfer was for an antecedent debt. Second, it is clear from the record that Rogich was an insider to the Debtor at the time of the March 11, 2011 transfer. Rogich concedes that he was a director of the Debtor at the time of the transfer. (Def.'s Resp., at 8, A.P. ECF No. 96; Rogich Aff. ¶ 14, A.P. ECF No. 98). Therefore, there is no genuine dispute as to any material fact that Rogich was an insider, as defined by the Bankruptcy Code and the FDCPA, and the Trustee is entitled to summary judgment on this issue.

b. Debtor Insolvency

Under the FDCPA, a debtor is presumed insolvent if its "is generally not paying debts as they become due." 28 U.S.C. § 3302. Case law analyzing this presumption is scarce. In *Kelley v. Speciale (In re Gregg)*, this Court applied a "flexible-totality-of-the-circumstances test" to determine whether a debtor was generally paying its debts as they came due in a fraudulent conveyance action under § 544(b)(1). 2013 WL 3989061, *15 (Bankr. M.D. Ga. 2013). This test is typically used by courts in determining whether the debtor is generally not paying its debts in the context of an involuntary petition filed against the debtor under § 303(h)(1). *Id.* Courts

8

"focus[] on the number of unpaid claims, the amount of the claim, the materiality of nonpayment and the overall conduct of the debtor's financial affairs." *Id.* (quoting *In re Knight*, 380 B.R. 67, 74 (Bankr. M.D. Fla. 2007)).

To prove insolvency, the Trustee offers the affidavit of Christopher Edwards, a certified public accountant ("CPA") with 28 years' worth of experience. Edwards analyzed the following documents in making his affidavit testimony: (1) the unaudited financial statement for 2010 as prepared by Rodney Hunter, CPA for the Debtor; (2) the audited financial statement for 2009 as prepared by Hunter; (3) the Internal Revenue Service's ("IRS") Proof of Claim for $2,867,753.62;[4] (4) Testimony from Hunter; (5) Pleadings related to a judgment for $1,863,221.32 in favor of Omniplex World Services Corporation ("Omniplex") against the Debtor; (6) Testimony of Jeffrey Brinson; (7) Email Correspondence between Brinson and City National Bank in January 2011; (8) the Debtor's Petition and Schedules; (9) Testimony of Paul Hackenberry; and (10) Testimony of Sigmund Rogich. After reviewing the documents, he concluded that the Debtor was generally not paying its debts as they became due at the end of 2010 and during 2011, and therefore, the Debtor should be presumed to have been insolvent during that time pursuant to the presumption of insolvency under the FDCPA. According to Edwards, the 2010 financial statement showing a shareholder's equity of $2,997,309.00 is not a true representation of the Debtor's worth. He reasons that Hunter, the CPA who created the financial statement, omitted the Omniplex debt and the IRS debt from the financial statement. Additionally, Edwards opines that Hunter failed to make an adjustment for the "fair value" of assets and liabilities for the purposes of determining insolvency under § 101(32). Furthermore, Edwards shows the following debts were due and owing by the Debtor: (1) judgment for over

---

[4] This figure represents the IRS's total claim. It has a secured claim for $1,943,422.83, an unsecured priority claim for $851,226.29, and a general unsecured claim for $73,084.50.

$1.8 million that was to be paid to Omniplex under an installment agreement in October 2010 but was breached by the Debtor in early 2011; (2) over $2 million in Federal Insurance Contributions Act ("FICA") taxes from the third quarter of 2010 to the end of the second quarter of 2011; (3) overdraft fees owed to Ameris Bank per an arrangement between the Bank and the Debtor to honor the overdraft causing checks; (4) $110,000 borrowed from Hackenberry to assist the Debtor in making payroll; (5) $100,000 borrowed from Rogich to assist the Debtor in making payroll; and (6) lease payments owed to Fred Taylor Company.

Rogich argues that Edwards did not apply a "flexible-totality-of-the-circumstances test" in his analysis because he did not focus on the "number of unpaid claims, the amount of the claim, the materiality of nonpayment and the overall conduct of the debtor's financial affairs." Rather, Edwards focused solely on the six debts listed above. The Court notes that the Trustee has offered evidence of unpaid claims, the amount of those claims, the materiality of nonpayment of those claims, and the overall conduct of the debtor's financial affairs to show the Debtor's inability to pay its debts as they became due. Specifically, the Trustee has offered evidence of six debts in amounts ranging from $100,000 to $2,867,753.62 that were due and owing at the beginning of 2011. However, this determination requires the court to consider the totality of the circumstances. *See In re Gregg*, 2013 WL 3989061, at *17 (determining that court did not have enough information to decide on the issue of whether or not the debtor was generally paying its debt as they became due on summary judgment). These six debts, although representing a substantial amount of money, were not the only debts owed by the Debtor at the time of the transfer. The Court does not know the total amount of debts becoming due. Therefore, the Court cannot weigh the totality of the circumstances to make a finding that the

10

Debtor was generally not paying its debts as they became due, as is required to presume that the Debtor was insolvent at the time of the transfer under the FDCPA.

Furthermore, the Court notes that a reasonable fact finder could determine that the Debtor was solvent under definition of insolvency as provided in 28 U.S.C. § 3302(a). No evidence has been presented in the form of an insolvency analysis under the balance sheet test. Furthermore, Edwards's opinion on insolvency does not appear to take into account the financial status of the Debtor during the time of the alleged insider-preferential transfer. Rather, he bases his opinion on the financial statements of 2009 and 2010, and Hunter testified that those financial statements do not suggest that the Debtor was insolvent. The record does not show that the sum of the Debtor's debts was greater than all of the Debtor's assets at fair value at the time of the insider-preferential transfers. Therefore, the Court finds that the Trustee has not carried his burden of showing that he is entitled to summary judgment as a matter of law on the issue of the Debtor's insolvency at the time of the March 11, 2011 transfer.

    c. Reasonable Cause to Believe Debtor was Insolvent

Whether a debtor has reasonable cause to believe a debtor was insolvent is a subjective inquiry that requires the court to consider the facts on a case-by-case basis. The Trustee argues that Rogich had reasonable cause to believe that the Debtor was insolvent because he had sufficient information to know that the Debtor was generally not paying its debts as they became due. The Trustee reasons that Rogich was aware of the following at the time of the transfer: (1) the Debtor had no line of credit; (2) it was operating on overdrafts on its Ameris Bank account; (3) Omniplex had a judgment against it for roughly $1.8 million; and (4) the Debtor was unable to make payroll without cash advances from its directors, including Rogich.[5] Furthermore, the

---

[5] The Trustee argues that the fact that the Debtor was soliciting a cash advance of $100,000 to make payroll should have put Rogich on "inquiry notice" that the Debtor was insolvent.

Trustee argues that Rogich would have known of the Debtor's inability to pay its debts if he had inquired. He contends that Rogich had access to accounts, was party to frequent telephone board meetings, and was in communications with the Debtor's CEO, Brinson.

Rogich offers his affidavit testimony to refute any claim that he had reasonable cause to believe that the Debtor was insolvent. Rogich maintains that he did not have any knowledge of the Omniplex judgment or the outstanding FICA and withholding taxes at the time of the transfer. (Rogich Aff. ¶¶ 19-20, A.P. ECF No. 98). Additionally, he states that he was never informed of the overdraft privileges offered by Ameris Bank in the months immediately preceding and proceeding the transfer. (Id. ¶ 20).

The record indicates that Rogich did not have access to financial information that would have notified him of any potential insolvency of the Debtor. In his affidavit, he maintains that the board held no meeting during the first quarter of 2011 and met only sporadically prior to that time. (Rogich Aff. ¶ 14, A.P. ECF No. 98). It is his contention that the he had no knowledge of the Debtor's finances, but he did receive financial statements periodically. (Id. ¶ 16). According to Rogich, these financial statements showed increasing revenues for the Debtor, and they were consistent with Brinson's representations of the Debtor's financial status. (Id. ¶17). At the time of the transfer, the only financial distress he was aware of was a cash flow issue due to late-payments on government contracts, which he knew from professional experience were commonly paid late. (Id. ¶¶ 8, 13). However, he "believed that BOA would not have been proceeding with a line of credit if there [were] any fundamental problems with [the Debtor's] finances." (Id. ¶ 18).

In his Response, Rogich suggests that the Debtor was not legally insolvent but rather was operating at a low capital at the time of the transfer. Therefore, the fact that the Debtor was

operating on overdrafts did not provide reasonable cause to believe the Debtor was insolvent. He offers the testimony of Hunter that the Debtor's government contracts were "very good receivables," but payments on government contracts are frequently late. (Hunter Dep. 93:6-94:4, A.P. ECF No. 76). In support of his argument, Rogich cites to the Fifth Circuit Court of Appeals case of *Lang v. First National Bank in Houston*, 215 F.2d 118 (5th Cir. 1954). In that case, the Fifth Circuit determined that First National Bank (the "Bank") did not have reasonable cause to believe that the debtor, a contracting business, was insolvent. *Id.* at 122. The Bank argued that even though it knew the debtor-contractor was having difficulties paying its current debts, it also knew the debtor-contractor had "several lucrative jobs in progress and that some were near completion." *Id.* at 120. The Fifth Circuit found this explanation to be reasonable. *Id.* at 121. The court also notes that "[i]t is well known in the business world that at a given time a large contractor may be insolvent in the sense that he owes more money than he has liquid assets; yet this is not necessarily insolvency in the legal sense." *Id.* at 120. Furthermore, the court determined that "[the Bank] was justified in not making inquiry into the legal solvency of [the debtor-contractor]." *Id.*

The Court notes that the FDCPA does not require proof of knowledge; it merely requires proof of reasonable cause to believe, which is a lower burden than knowledge. However, the Court finds that a genuine issue of material fact exists as to whether Rogich had reasonable cause to believe that the Debtor was insolvent at the time of the transfer. Rogich has offered his own affidavit testimony and the deposition testimony of Hunter to show that Rogich did not have reasonable cause to believe that the Debtor was insolvent. This determination requires a subjective inquiry into Rogich's beliefs and the reasonableness of those beliefs based on the circumstances surrounding the Debtor's solvency at the time of the transfer. Therefore, the

13

Court must weigh the credibility of testimonial evidence to determine the reasonableness of Rogich's beliefs and ultimately, whether the Trustee is able to carry his burden of proving reasonable cause to believe.

Lastly, the Trustee argues that Rogich was not acting within proper business judgment when he failed to inquire about the financial status of the Debtor before advancing $100,000. He premises his argument on the "business judgment rule," which "serves as a rebuttable presumption that a director of a corporation was informed and approached their business decision with honesty and good faith." *Post Confirmation Comm. for Small Loans, Inc. v. Martin*, 2016 WL 3251408, at *11 (M.D. Ga. June 13, 2016). The Trustee points out that some courts have determined that the "[p]rotection of the business judgment rule will be lost if the director appears on both side of the transaction or derives financial benefit from it." *In re Intercat, Inc.*, 247 B.R. 911, 922 n.5 (Bankr. S.D. Ga. 2000) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)). Rogich argues that he discharged his duties according to the business judgment rule under Georgia law, as codified in O.C.G.A. § 14-2-830, and the testimonies of Brinson, the CEO of the Debtor, and Hunter, the Debtor's CPA, show that a reasonable reliance on their representations would not require an additional inquiry by Rogich.

It is unclear what the Trustee is attempting to argue by citing the business judgment rule. Assuming that he is arguing that the business judgment rule applies, the Court is not persuaded that the presumption that a director is informed under the business judgment rule equates to the presumption that the creditor, who is an insider by virtue of his director status, had reasonable cause to believe that the debtor was insolvent. Ultimately, the record indicates that Rogich was acting within the business judgment rule by relying on the representations of Brinson and Hunter. However, if he is arguing that the rule should not apply because Rogich is on both sides

of the transaction as creditor and director of the debtor, then the Court opines that not acting within proper business judgment by not inquiring about the finances of the debtor does not per se prove that the creditor-director had reasonable cause to believe the debtor was insolvent.

## Conclusion

In accordance with the reasoning articulated above, the Court will GRANT partial summary judgment to the Trustee as to Rogich being an insider of the Debtor. The Trustee has shown Rogich is a statutory insider pursuant to § 101(31)(B)(ii) due to his status as a director at the time of the transfer on March 11, 2011, and Rogich does not refute that fact. The Court will DENY summary judgment as to the following issues: (1) whether the Debtor was insolvent on March 11, 2011; and (2) whether Rogich had reasonable cause to believe that the Debtor was insolvent on March 11, 2011. As to the issue of insolvency, the Trustee must show that the Debtor was generally not paying its debts as they became due to receive the benefit of the presumption of insolvency under the FDCPA. Based on the record, the Court determines that the Trustee has not met his burden in showing that he is entitled to a judgment as a matter of law on that issue. As to the issue of reasonable cause to believe, the Court finds that a genuine issue of material fact exists.

An order will be entered in accordance with this Memorandum Opinion.