

**SIGNED this 12 day of October, 2018.**

John T. Laney, III
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **ALPHA PROTECTIVE SERVICES, INC.,** | § | Case No. 12-70482 |
| Debtor. | § | Chapter 7 |
| | § | |
| | § | |
| **NEIL C. GORDON**, as Trustee in Bankruptcy | § | |
| For Alpha Protective Services, Inc., | § | |
| Plaintiff, | § | Adversary Proceeding |
| v. | § | No. 14-07033 |
| | § | |
| **SIGMUND ROGICH**, | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

The Court tried the above styled case[1] between September 19 and September 27, 2018.

The Plaintiff in this action seeks to avoid a pre-petition payment made by the Debtor to the

Defendant, pursuant to 28 U.S.C. § 3304(a)(2). The parties consented to the Court's entry of a

final order. *See* 28 U.S.C. § 157.

---

[1] The parties litigated and tried this case simultaneously with *Gordon v. Hackenberry*, 14-07032-JTL. This opinion only concerns the above styled case. The Court will issue a separate opinion and judgment in the *Hackenberry* case.

At the conclusion of the evidence, the Court took this matter under advisement to review the evidence presented and to draft this memorandum.  Having carefully reviewed the applicable law and the record in this case, the Court issues a judgment in favor of the Defendant.  The following memorandum explains the Court's reasoning in coming to this conclusion.

## I.    BRIEF STATEMENT OF THE CASE

Alpha Protective Services ("APS") filed a petition under Chapter 11 of the Bankruptcy Code on April 12, 2012.  (Pet., Bankr. Doc. 1).  The case was converted to a Chapter 7 on December 20, 2012.  (Order Granting Motion to Convert, Bankr. Doc. 156).  Neil Gordon was appointed Chapter 7 trustee on the same day.[2]  (Notice of Appointment of Trustee, Bankr. Doc. 158).  The case before the Court is an adversary proceeding arising from APS's bankruptcy.  The Trustee brings this action under the Federal Debt Collection Procedures Act ("the FDCPA").  28 U.S.C. §§ 3001-3308.  He may assert this claim through 11 U.S.C. § 544(b)(1).  *See Gordon v. Harrison (In re Alpha Protective Servs.)*, 531 B.R. 889, 906 (Bankr. M.D. Ga. 2015) (permitting a Chapter 7 Trustee to assert an avoidance claim under the FDCPA).

28 U.S.C. § 3304(a)(2)(A) provides:

(a)  … [A] transfer made… by a debtor is fraudulent… if…
(2)(A) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time; and
(B) the insider had reasonable cause to believe that the debtor was insolvent.

These basic facts are not disputed:  On January 27, 2011, Sigmund Rogich, the Defendant ("Rogich"), advanced $100,000 to help APS make payroll at the request of Jeffery Brinson, the Debtor's president and CEO ("Brinson").  APS repaid Rogich on March 11, 2011 ("the

---

[2] Prior to the order converting the case, Neil Gordon was appointed Chapter 11 Trustee.  (Order Approving Notice of Appointment of Chapter 11 Trustee, Bankr. Doc. 150).

Transfer"). This repayment is the subject of the avoidance action. Rogich was a member of the

APS's board of directors at the time of the Transfer. Further, the Transfer occurred within two

years of filing this case and is thus within the FDCPA's statute of limitation. *See* 28 U.S.C. §

3306(b)(3); *see also* 11 U.S.C. § 108(a) (extending any statute of limitation that has not expired

before filing a petition under Title 11).

The Court granted partial summary judgment on two of the claim's elements,

determining Rogich was an insider and that the Transfer was on account of an antecedent debt.

(Order Granting Partial Summary Judgment, A.P. Doc. 103). Therefore, the only issues before

the Court at trial were (i) whether APS was insolvent at the time of the Transfer and (ii) whether

Rogich "had reasonable cause to believe that the debtor was insolvent" at the time of the

Transfer.

## II.    FINDINGS OF FACT

APS is a Georgia corporation that provided private security services primarily through

government contracts. In 2004, Brinson held a majority of the shares in APS. Two other

shareholders, Guy and James Harrison, held minority interests. After providing security

personnel at the G8 summit on Sea Island, Georgia in 2004, Brinson met Paul Hackenberry

("Hackenberry"), a well-respected security consultant. Hackenberry offered Brinson assistance

in obtaining federal contracts. Brinson believed Hackenberry's services would benefit APS and

hired Hackenberry as a consultant. His decision was apparently against the wishes of the

minority shareholders.

### a. The Harrison Dispute

Hackenberry's continued involvement with APS and other personal disputes between

Brinson and the Harrisons further divided APS's shareholders. These disputes escalated in 2006,

when Brinson removed James Harrison from APS's board of directors and appointed

Hackenberry to the board.  In response, the Harrisons caused APS's bank to withdraw its line of

credit.  These events triggered litigation between the shareholders, which the parties resolved

through a settlement agreement in June 2007.  The settlement required APS and Brinson to

purchase the Harrisons' shares for $1,543,500 and pay $1,606,500 for services performed by

James Harrison's consulting business.  After making an initial $1 million payment, APS financed

the remaining amount due on the settlement through a note requiring eighty-four (84) monthly

payments of approximately $30,000.  Brinson then executed a note agreeing to repay APS for its

purchase of the Harrisons' stock.  Brinson never made payments to APS on account of this note.

Rogich's involvement with APS began around this period of time.  Through a mutual

acquaintance, Brinson and Hackenberry contacted Rogich about assisting APS with financing.

Rogich helped APS obtain a line of credit and term note from Business Bank of Nevada

("BBNV").  This line of credit was used to pay the $1 million dollar payment under the Harrison

settlement.  Both Hackenberry and Rogich personally guaranteed APS's obligations to BBNV

under these loans.  After the settlement and financing agreements, Brinson became APS's sole

shareholder and Rogich joined APS's board of directors.  During this time, the board met

periodically, either formally or informally on conference calls, to discuss new business

opportunities.  Outside of some discussions about future distributions of APS's stock, the board

members did not discuss the company's financials.  Hackenberry and Rogich's primary roles

with the company were to facilitate APS's procurement of new government contracts through

their connections within the federal government.

At some point, City National Bank ("CNB") acquired BBNV and, accordingly, became

the holder of APS's obligations under the line of credit and term notes.  Between CNB's

4

acquisition and August 2008, APS defaulted on some payments under the line of credit, causing

a technical default on the term loan through a cross-default provision.  Additionally, CNB

expressed its desire to concentrate its business within western states and the bank stated it no

longer desired to continue extending credit to APS.  Together, these factors lead CNB to

negotiate a forebearance agreement whereby APS would pay down the line of credit's balance by

$1.1 million by December 2008.  APS would additionally continue to make regular interest and

principal payments on the term loan and line of credit in accordance with those notes.  APS paid

its obligations under the forebearance agreement and, by July 2009, paid the entire balance on

the line of credit.

### b.   APS's Financials Between 2007 and 2010.

While APS worked to stabilize its finances in the wake of the Harrison agreement, APS

continued its operations and expanded its business by obtaining additional government security

contracts.  APS's consolidated financial statements between 2007 and 2010 show the company's

revenue increased each year; further, the company was expanding its assets and decreasing its

liabilities throughout this period.  At least some of these increases were attributable to a joint

venture, of which APS was a controlling member.  The company was even attracting large equity

investment offers and potential buy-outs.  In the summer of 2008, Cerberus Capital Management,

L.P. offered to purchase $18 million of preferred stock in the company.  In October 2010, APS

discussed a $16 million purchase offer from the Cherokee Nation.  Neither of these opportunities

materialized for APS.  Brinson's failure to timely provide necessary documentation was partially

to blame for withdraws of these offers, but the country's poor financial condition during these

years was at least an equal factor.

Altogether, APS was a profitable and even an attractive investment between 2007 and 2010. This is not to say APS was thriving. It was experiencing financial difficulties. But at least until the fourth quarter of 2010, it appears most of the company's problems were related to its monthly cash flows not its underlying financials. APS's receivables were overwhelmingly from government contracts and payments on these contracts were often delayed. As a result, APS was frequently late in paying the Harrison settlement and the CNB forbearance payments. Moreover, APS's immediate need for payment often caused Brinson to accept less than the amount due on the contract to negotiate quicker payment. This created cash flow crunches that were not dissimilar to those experienced by many other small businesses with large amounts of government receivables.

APS's cash flow problem worsened after APS paid CNB's line of credit. During this time, Brinson attempted to operate APS without drawing from a line of credit. This, in retrospect, was an error. Even without the financing costs associated with CNB's credit line, APS continued to experience cash flow problems. APS relied on overdraft privileges extended by Ameris Bank to address these problems. On numerous months, APS overdrafted its account with the bank. When APS received payment on its contracts, however, it paid the overdrafts and the associated overdraft fees, which Brinson testified were as much as 40% of the overdrafts. Brinson quickly realized that APS's cash flows necessitated a line of credit and sought a loan from Ameris Bank. Despite numerous requests, however, Ameris Bank refused to extend APS credit. Brinson believed the bank had no incentive to extend a credit line because it was generating much higher returns through assessing overdraft fees. Whether this was Ameris Bank's reasoning in refusing to extend credit is not in the record. It is clear, however, that meaningful discussions with Ameris Bank about a line of credit never materialized and the bank

never performed any significant review of APS's financials.  It is also clear that APS was paying much higher financing costs using the overdraft privilege than it would have paid under a line of credit.

Rogich and Hackenberry were aware that APS was relying on overdraft privileges.  To address the company's cash flow issues, Hackenberry introduced Brinson to a contact he had with Bank of America. The members of APS's board were hopeful the bank would extend an $8 million line of credit.  Not only would the credit line address cash flow issues, it was necessary for APS to bid on a large federal contract with the United States Marshals Service, which, if APS won the bid, would produce approximately $100 million in annual revenue for the next ten years ("the USMS Contract").  In addition to the credit line, Bank of America would also refinance CNB's term loan, which had a remaining balance of approximately $500,000.   Like the CNB term loan, Hackenberry and Rogich offered to give personal guarantees on the term loan but did not offer guarantees on the line of credit.  Bank of America began its due diligence in late December 2010 and, after Brinson met with a representative at the bank, APS's board members and employees at APS were optimistic the bank would extend credit.  Over the course of Bank of America's due diligence in January 2011, bank representatives were on site at APS's headquarters for multiple days and had access to APS's financials and its external accountant. Ultimately, APS did not obtain the USMS Contract.  Bank of America did, however, extend a line of credit, albeit at a reduced credit limit, and refinanced the term loan around May 2011.

### c.  OmniPlex and FICA Liabilities

In January 2010 APS was sued by OmniPlex, a subcontractor.  The lawsuit stemmed from services OmniPlex provided in connection with APS's contract at Fort Bragg.  Between July and November 2009, APS withheld approximately $1.5 million in payments from

OmniPlex.  Brinson withheld these payments because he believed OmniPlex failed to provide adequate services.  The parties reached a settlement agreement on October 15, 2010 ("OmniPlex Settlement").  The settlement required APS to pay $100,000 instanter and thirty (30) successive monthly payments of $30,000.   APS made the initial $100,000 payment and the monthly payments through at least March 2011, though some payments were technically late.  Rogich had no knowledge of the dispute with OmniPlex.

Additionally, beginning around September 2010, APS failed to pay its Federal Insurance Contribution Act withholdings ("payroll taxes" or "FICA taxes") to the Internal Revenue Service ("the IRS").  As of the end of 2010, APS owed over $380,000 in FICA taxes.  By June 2011, APS was over $1.7 million delinquent.  Through March 2011, of the directors, only Brinson was aware of APS's mounting FICA liabilities.

Brinson largely kept APS's financials to himself, especially regarding the OmniPlex Settlement and delinquent FICA taxes.  Although APS employees were generally aware that APS disputed it owed money to OmniPlex, the dispute was not commonly discussed and the employees did not know the exact amount in dispute or the likelihood that either party might succeed.  Neither Rogich nor any employee knew of the OmniPlex Settlement.  Brinson even misrepresented the OmniPlex Settlement and FICA tax liabilities to his external accountant, Rodney Hunter ("Hunter").  While preparing a reviewed 2010 financial statement in April 2011, Brinson told Hunter the OmniPlex lawsuit was pending and that APS did not expect any significant liabilities.  Hunter's note in the financial statement reflects his understanding of that conversation.  The note states, "[APS] is a defendant in a lawsuit alleging breach of contract regarding services rendered."  It continues, "[t]he ultimate outcome of the lawsuit cannot presently be determined, but management is of the opinion that it will not have a material impact

8

on [APS's] financial position." Clearly, this note is incorrect. The OmniPlex consent judgment was entered in October of 2010 and—being settled at nearly half of APS's reported equity—it was certainly material to APS's financial position. Further, the financial statement did not indicate APS failed to remit its 2010 fourth quarter FICA taxes. But the inconsistences in the financial statements were only known to Brinson. Hunter only discovered the OmniPlex Settlement in September 2011 after he, as a part of performing an audit, requested a representation letter from APS's lawyer in the OmniPlex case.

### d.  The Transfer

In January 2011, Brinson requested a $100,000 loan from Rogich to assist APS in making payroll. Brinson also requested a $110,000 loan from Hackenberry. Brinson assured both board members that, as soon as APS received money from its federal contracts, the loan would be repaid. Rogich and Hackenberry discussed the loan and agreed that they would assist APS in making its payroll. Although the board members were certainly frustrated with having to make the loan, they understood APS's financial difficulties as being a result of cash flow problems. Both were aware the company was in the process of addressing that issue by attempting to obtain a line of credit with Bank of America. Neither board member requested financial documents from APS nor did they perform any other due diligence. On March 11, 2011, APS repaid Rogich ("the Transfer"). APS had repaid Hackenberry on February 11, 2011.

### III.   CONCULSIONS OF LAW

Before addressing the Court's conclusions, it is important that the Court address the case law used in interpreting 28 U.S.C. § 3304(a)(2). As the Court acknowledged in its prior memorandum opinion in this case, case law on this subsection is sparse. (Memorandum Opinion on Plaintiff's Motion for Summary Judgment A.P. Doc. 104). There are a number of opinions,

however, interpreting this same language in state-law fraudulent transfer actions and the

Bankruptcy Code.  These statutes share a similar history [3] and the case law interpreting the

language within these statutes is well established.  As a matter of statutory interpretation, courts

are to assume that, "when judicial interpretations have settled the meaning of an existing

statutory provision, repetition of the same language in a new statute indicates, as a general

matter, the intent to incorporate its judicial interpretations as well."  *Jerman v. Carlisle,*

*McNellie, Rini, Kramer & Ulrich, L.P.A.*, 599 U.S. 573, 590 (2010) (quoting *Bragdon v. Abbott*,

524 U.S. 624, 645 (1998)) (internal quotation marks and ellipsis omitted).  As such, case law

prior to the FDCPA's enactment on November 29, 1990 that interprets similar language is

appropriate authority.

Regarding the burden of proof, the burden as to all elements is on the Trustee.  *In re A.*

*Fassnacht & Sons, Inc.*, 826 F.2d 458, 460 (6th Cir. 1987).  He must prove those elements by a

preponderance of the evidence.  *Id.* (citing *Green v. A.G. Edwards & Sons, Inc.*, 582 F.2d 439,

442 (8th Cir. 1978)).

Having addressed the Court's basis for using the cited authorities and the burdens of

proof, the following subsections will address the contested elements in this case.

### a.  Insolvency

Like the Bankruptcy Code, the FDCPA defines insolvency.  The FDCPA provides: "a

debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a

fair valuation."  28 U.S.C. § 3302(a).  To determine APS's solvency then, the Court must value

---

[3] The FDCPA, the insider preference action that formally existed in the Bankruptcy Code, and state-law fraudulent transfer statutes that have adopted the Uniform Voidable Transactions Act ("UVTA") share similar "roots."  The language of each of these statutes stem from the Uniform Fraudulent Conveyance Act.  *See* Uniform Voidable Transactions Act § 5 cmt. 2 (noting the historical development of insider preference actions).  In fact, the language used in the statutes are essentially identical.  *Compare* O.C.G.A. § 18-2-75(b) (the Georgia adaptation of the UVTA), 28 U.S.C. § 3304(a)(2)(A), and 11 U.S.C. § 547(b)(4)(B) (1980).

APS's assets and its liabilities.  The company's financial statements provide a starting point for

this determination.  APS's financial statements showed positive cash flows and considerable

equity.  A reviewed 2010 financial statement created on April 18, 2011 listed $2,997,309 in

shareholder's equity.[4]  But, the financial statements failed to list liabilities that, if reported,

would have significantly depleted APS's equity.  First, the $1.8 million OmniPlex Settlement

was not disclosed, though it was negotiated and entered on the trial court's docket prior to year-

end 2010.  Second, the financial statements failed to show APS's FICA tax liabilities.  APS's

exact liability at the time of the Transfer is unclear, though the evidence does show that in

December 2010 APS's FICA taxes were $389,734 delinquent.  Adding the OmniPlex Settlement

and FICA tax delinquencies together, the liabilities significantly decrease APS's reported equity.

Even if the Court were to only consider APS's FICA tax liabilities as of December 2010, APS's

equity would be less than $1 million, approximately a 66% reduction from the reported equity.

When the Court discounts other assets on APS's balance sheet, there is no doubt that APS

was insolvent within the meaning of 28 U.S.C. § 3302(a).  The FDCPA's definition of

insolvency, like the Bankruptcy Code's, requires courts to consider the "fair value" of the

debtor's assets.  In performing a fair value analysis, a court does not have to accept the values

listed on financial statements and may consider any contingencies that impact an asset's fair

value.  *In re Xonics Photochemical*, 841 F.2d 198, 200 (7th Cir. 1988); *see also In re Chase &*

*Sandborn Corp.*, 904 F.2d 588, 594 (11th Cir. 1990) (quoting *Xonics Photochemical* in

determining the contingent value of a loan secured by valuable assets and guaranteed by solvent

entities).

---

[4] This statement is within the closest proximity to the date of the Transfer and is the only reviewed 2010 statement; therefore, the Court finds it the most indicative of the value of APS's assets at the time of the transfer.

There are at least two bases for discounting APS's financial statements.  First, APS reported a shareholder receivable worth approximately $1.7 million.  The reported receivable corresponded to Brinson's debt to APS for payments the company made on his behalf to purchase the Harrisons' stock in accordance with the settlement agreement.  APS, as opposed to Brinson personally, made all of the payments under this settlement agreement.  Brinson never repaid his obligations to APS.  Although there is nothing unusual about the sole shareholder of a closely held corporation using company assets to pay personal obligations, a fair value analysis requires the Court to determine the value of receivables based on the likelihood of repayment at the time of valuation.  There is no evidence Brinson had the ability to repay his personal obligation to APS at time the Transfer was made.  Therefore, under a fair value analysis, the Court finds it should completely discount the shareholder receivable.   With this adjustment, APS's remaining equity diminishes and the Court concludes APS was insolvent at the time of the Transfer.

The second adjustment only further convinces the Court that APS was insolvent.  APS's financial statement does not reflect the fair value of APS's interest in the joint venture, of which APS held a majority interest.  The financial statements show APS held a $1.7 million interest in the company.  But, the value listed in the financial statement does not consider that important corporate decisions in the subsidiary, such as decisions to wind-down or sell stock, required unanimous consent.  Thus, any premium that might be associated with a majority interest in the subsidiary must be discounted because APS's ability to liquidate the stock was limited.  The exact amount the Court should discount this asset is unclear.  The Trustee's expert testified that the Court should reduce the entire reported value of the joint venture.  The Court does not believe this is correct.  There is surely some value to APS's interest in the joint venture; in fact, it

12

was a large source of revenue for APS.  That said, the totality of the other adjustments in APS's

financials clearly indicates APS was insolvent.  Any further discount associated with APS's

interest in the joint venture would only further deepen APS's insolvency.

### b.  Reasonable Cause to Believe the Debtor was Insolvent

A plaintiff brining an action under 28 U.S.C. § 3304(a)(2) may prove the transferee "had

reasonable cause to believe the debtor was insolvent" under two theories.  First, the plaintiff may

show the transferee knew of facts and circumstances that, if known by a reasonably prudent

business person, would have led the business person to believe the debtor was insolvent.  *In re

Frigitempt Corp.*, 34 B.R. 1000, 1004 (S.D. N.Y. 1983); *Cissell v. First National Bank of

Cincinnati*, 476 F. Supp. 474, 484 (S.D. Ohio 1979).  If unable to show the transferee was aware

of such circumstances, knowledge of the debtor's insolvency can be imputed to the transferee if

the plaintiff demonstrates the transferee should have been on "inquiry notice" of the debtor's

insolvency.  *In re A. Fassnacht & Sons, Inc.*, 826 F.2d at 461; *In re Frigitempt Corp.*, 34 B.R. at

1004.

### i.  Rogich's Knowledge of APS's insolvency

To succeed under the first theory, the Trustee must show the facts known to the transferee

and demonstrate that knowledge of those facts would have lead a reasonably prudent business

person to believe APS was insolvent.  Where the circumstances would have only raised a

suspicion that the debtor was insolvent, however, the plaintiff has failed to support its burden.

*Mayo v. Pioneer Bank & Trust Co.*, 297 F.2d 392, 394 (5th Cir. 1961) ("If the known facts

should raise only a suspicion that the debtor might be insolvent, the test is not met"); *Shaw v.

Walter E. Heller & Co.*, 258 F. Supp. 394, 402-03 (N.D. Ga. 1966); *see also Grant v. Frist Nat.

Bank*, 97 U.S. 80, 81 (1877) ("It is not enough that a creditor has some cause to suspect the

insolvency if his debtor; but he must have such a knowledge of facts as to induce a reasonable

belief of his debtor's insolvency[.]") Therefore, the Court's responsibility here is to determine

what Rogich knew of APS's solvency and then determine whether a reasonably prudent business

person would have believed APS was insolvent based on that knowledge.

Rogich had no knowledge of the OmniPlex dispute or of APS's FICA tax liabilities.

While Rogich was aware that APS was facing cash flow issues, Rogich did not believe APS was

unable to operate as a going concern.  Rather, the evidence shows Rogich believed APS's

financial difficulties were solvable by obtaining a line of credit.  At the time of the Transfer, APS

was paying operating expenses with the assistance of overdraft privileges.  The record indicates

APS was paying the overdrafts and the associated fees—which were substantially larger than

debt servicing costs associated with lines of credit—with deposits from APS's various

government contracts.  Moreover, at the time of the Transfer, Rogich understood Hackenberry

was assisting APS in addressing this problem by connecting it with Bank of America which was

performing due diligence to extend a line of credit.

While Rogich may have had concerns about APS's financials in 2010, these concerns

would not have led a reasonably prudent business person to believe APS was insolvent.  The

evidence showed that a reasonably prudent business person would have concluded, as Rogich

did, that APS was experiencing temporary and solvable cash flow and capital structure problems.

The unanimous opinion from expert and fact witnesses was that government receivables, while

being reliable in terms of low default rates, are widely known for being delayed in payment.

Moreover, witnesses testified that many similarly sized firms with large proportions of

government receivables commonly experience cash flow problems if they are unable bridge

payable and receivable gaps with a line of credit.  Rogich was not aware of any other

14

circumstances that would have indicated to a reasonable business person that APS's financial problems were anything beyond a common cash flow problem experienced by many similar businesses.

Additionally, the Trustee argued Rogich was aware of other non-financial circumstances that would have led an ordinarily prudent person to believe APS was insolvent.  First, he argues that APS stopped conducting official board meetings in 2010 after regularly conducting meetings in the years prior.  But the evidence shows APS never truly established a pattern of conducting board meetings and the board members did not suddenly stop communicating in 2010.  Although the record indicates there were more board meetings and conference calls when APS was expanding its operations between 2007 and 2009, the board members who testified at trial all stated that informal conference calls also occurred in 2010.  The informality of meetings would not have raised any alarm.  Experts familiar with the operation of small closely-held corporations testified that the practice of holding informal conference calls in-lieu of formal board meetings is common for companies of APS's size.  The Court concludes a reasonable business person would not have been alarmed by APS's methods of communication.

The Trustee also points to emails that show Rogich's frustration with Brinson's inability to timely provide documents to various stakeholders.  But these emails only indicate that Brinson was frequently unresponsive, not that Brinson was hiding poor financials or incapable of running the business.  In addition to failing to provide financial documents, Brinson failed to provide other non-financial documents, such as proof of Director's and Officer's Insurance and minutes of board meetings.  This was clearly frustrating to Rogich, and it would certainly have been the same to any business person, but it would not have led a reasonable business person to believe APS was unable to continue operating as a going concern.

The facts known to Rogich indicated that APS was on the verge of transitioning from a solvent but struggling small business to a very profitable endeavor.  APS had received sizable investment and buy-out offers.  Moreover, the company was in the process of bidding on the $1 billion USMS Contract and the board members all stated that APS's prospects of obtaining the contract seemed good.  Further, APS was working to obtain a line of credit with Bank of America which would give the company flexibility to avoid mounting overdraft fees.  These prospects made Rogich's willingness to extend the loan and his conclusion that APS could repay him reasonable.  The Trustee failed to present evidence that a reasonably prudent business person, knowing what Rogich knew, would have believed anything otherwise.

It is only with the benefit of hindsight (knowing that APS would not obtain the USMS Contract) and with knowledge of the OmniPlex Settlement and FICA tax liabilities that a reasonable business person could have believed APS was insolvent.  But, Rogich could not have known APS would not obtain the USMS Contract and did not know about the OmniPlex Settlement and FICA tax liabilities.  He reasonably believed the company could continue as a going concern if it were to access a line of credit.

Finally, the Trustee argues that, because Rogich was a member of APS's board of directors and owed APS a duty of care, he had unique insider knowledge or at least unique access to APS's financial information and should be charged with knowledge of APS's insolvency.  The case law, however, is clear that a court should not impute knowledge of a debtor's insolvency to a transferee solely because of the transferee's relationship with the debtor. *See In re A. Fassnacht & Sons, Inc.*, 826 F.2d at 462 (citing *Matter of Citzens Loan & Savings Co.,* 621 F.2d 911, 914 (8th Cir. 1988) and *Carrol v. Holliman,* 336 F.2d 425(10th Cir. 1964)). It is true that courts have considered the sophistication of the transferee and his relationship to

16

the debtor when determining whether the transferee knew of the debtor's insolvency. *E.g.*, *In re Frigitemp Corp., 34 B.R.* at 1004. But, the transferee's relationship to the debtor is only relevant when it actually gave the transferee knowledge of the debtor's finances. *Compare Id.* at 1009 (finding that a transferee who sat on the debtor's board of directors, served on its audit committee, attended meetings with the debtor's bankers concerning non-payment, and engaged the law firm assisting the debtor in preparing a Chapter 11 petition had reasonable cause to believe the debtor was insolvent) *with In re A. Fassnacht & Sons, Inc.*, 826 F.2d at 462-63 (distinguishing the transferee in that case, who was not involved with the day-to-day operations or finances of the company, from the transferee with actual knowledge of insolvency in *Frigitemp*).

Here, the evidence is clear that Rogich's involvement with APS was much more like the *Fassnacht* defendant than like the *Frigitemp* defendant. Again, Rogich's role with the company was limited to advising on new business opportunities, not with the finances and day-to-day operations of the business. No evidence suggests Rogich knew of APS's financials or other non-public information that would have lead a reasonable business person to doubt APS's ability to repay its debts. Further, it occurs to the Court that, if the Trustee's argument was correct, courts would have to presume all corporate directors had knowledge of insolvency in every insider preference action, regardless of whether they knew of facts indicating the debtor was insolvent. This would essentially eviscerate the 28 U.S.C. § 3304(a)(2)(B) element for corporate director defendants and thus cannot be the correct interpretation of the law. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall

17

be superfluous, void, or insignificant." (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (internal quotation marks omitted).

In conclusion, the Trustee has not meet his burden to prove that, had a reasonably prudent business person known what Rogich knew about APS, that business person would have believed APS was insolvent. At most, the information available to Rogich might have lead a reasonably prudent business person to suspect APS had financial problems. But a *suspicion* of financial problems, is insufficient to prove the Trustee's case. That is not to say that Rogich's knowledge is irrelevant to the issues remaining before the Court. As the next subsection will discuss, these facts might sufficiently have led a reasonably prudent business person to make an inquiry regarding the debtor's solvency.

### ii.  Inquiry Notice of Insolvency

Where the plaintiff is unable to show reasonable cause to believe the debtor was insolvent based on facts known to the transferee, the plaintiff may impute knowledge of insolvency where the transferee should have inquired about the debtor's solvency and such an inquiry would have revealed the debtor was insolvent. *Cissell*, 476 F. Supp. at 484 ("[W]here circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed.") This analysis requires a three part determination:

> [i] First, the court must determine whether circumstances exist that would lead an ordinarily prudent business person to make an inquiry. [ii] Second, where such circumstances exist and the creditor has failed to make any inquiry, the court must impute to the [transferee] that knowledge which he would have acquired had a 'reasonably diligent' inquiry been made. [iii] Third, if the imputed knowledge would have given the [transferee] reasonable cause to believe that the debtor was insolvent, the court should allow the trustee to void the preferential treatment which had been received by the creditor.

*In re Fassnacht & Sons, Inc.*, 826 F.2d at 461.

As to whether an ordinarily prudent business person would have made an inquiry of APS's solvency in this case, the Trustee directs the court to many of the same circumstances listed in the prior subsection. For example, the Trustee's experts agreed that, while cash flow problems are not conclusive of insolvency, APS's reliance on overdraft privileges would have led a reasonable business person to investigate whether APS had sufficient receivables to continue its operations.

The Trustee's experts also stated that a reasonably prudent business person would have made an inquiry of APS's solvency immediately after being asked to extend a loan for payroll. They gave two reasons for coming to this opinion. First, there is an unsurprising correlation between companies that are unable to make payroll and insolvency. Secondly, under federal law, a lender who provides a loan for the purpose of making payroll could be personally liable for a portion of the company's tax liabilities if the company does not pay withheld payroll taxes to the IRS. *See* 26 U.S.C. § 3505(b). The experts testified that a reasonably prudent business person would have generally known of this law and that this potential for liability would have given him reason to inquire about the status of payroll taxes. Considering the evidence, the Court is persuaded that the circumstances known to Rogich would have led an ordinarily prudent business person to make further inquiry.

Having addressed the first part of this analysis, the Court must now determine what a reasonably diligent inquiry would have discovered. The standard requires a hypothetical inquirer to do more than merely accept an answer when "under the circumstances, [that answer] could readily have been found untrue." *Bernstien v. S. Cent. Bell Tel. Co.*, 730 F.2d 987, 992 (5th Cir. 1984). But, the standard does not impose "an extraordinary duty" of investigation and should

regard realistic and common business practices. *In re Fassnacht & Sons, Inc.*, 826 F.2d at 463

(citing *Security-First Nat'l Bank v. Quittner*, 176 F.2d 997, 999 (9th Cir. 1949)).

A reasonably prudent business person's inquiry would have begun by examining the

company's financial statement.  Brinson testified that, had any person asked him for financials

around the time of the Transfer, he would have provided one of two preliminary 2010 financial

statements.  His testimony is credible because these financial statements were, in fact, created

after third-parties made inquiries.  Even if an inquirer requested financials from another APS

employee, the evidence shows the inquirer would have received the same documents.  APS's

employees and its accountant testified that Brinson limited others' access to the company's

financial documents.  Besides Brinson, only the company's outside accountant, Hunter, had full

access to APS's financials.  Hunter testified that if any person—even a member of APS's

board—contacted him requesting APS's financial statements, he would have asked Brinson what

to provide the inquirer.  Altogether, it seems that, had any party requested financial documents

from APS employees, Brinson, or Hunter, the inquirer would have received the financial

statements described above.

These financial statements indicate substantial equity, showing shareholder's equity of

over $3.3 million as of September 30, 2010 and $4.5 million as of December 31, 2010.   While

the face of the documents would not have indicated insolvency, an expert for the Trustee testified

that, if one were to closely examine APS's debt ratios, the statements would have shown APS

was overleveraged.  The Court finds two problems with this testimony.  First, the expert offering

this opinion calculated the ratios with figures from the reviewed 2010 financial statement, which

was created after Rogich received the Transfer.  At the time the Transfer was made, an inquirer

could not have come to the same conclusion because he would not have had access to the figures

upon which the expert relied.  Had the expert used the preliminary 2010 financial statements to

calculate these ratios, the calculations would have incorporated those statements' larger cash

flows.  Because some of the ratios cited by the expert as concerning, such as APS's current

assets to current liabilities, were only just outside the range many professionals find acceptable,

using statements with larger cash flow figures could have materially changed the inquirer's

opinion of APS's financials.

Secondly, the expert's analysis is beyond what a court should expect from an inquirer

performing a reasonably diligent inquiry.  The expert's prior work experience was with a fortune

five-hundred business that was publicly traded and had access to a large accounting department.

He stated the ratio analyses he completed were regularly performed at this company.  He further

testified the company may have performed these analyses to comply with Securities and

Exchange Commission regulations.  APS, however, was under no similar legal obligations.

Further, other evidence indicated that smaller closely-held businesses, such as APS, do not

regularly perform these types of financial calculations.  As previously stated, a reasonably

diligent inquiry must comply with realistic and common business standards.  Accordingly, in

determining the scope of a reasonably diligent inquiry involving a company the size of APS, the

Court will not require an inquirer to perform complex financial calculations performed by

publicly traded companies with large accounting departments.

The preliminary 2010 financial statements did not disclose the OmniPlex Settlement and

FICA tax liabilities, and, therefore, an inquirer would not have discovered the liabilities through

those statements.  Still, the Trustee argues that a reasonably diligent inquirer would have

discovered these large liabilities by calling a board meeting or reviewing APS's other financial

records.  The evidence before the Court, however, reveals Brinson interfered with the company's

financial reporting such that not even Hunter discovered the misrepresentations while reviewing the company's financials.  Around April 2011, well after the entry of the OmniPlex Settlement, Brinson explicitly told Hunter the OmniPlex litigation was still pending and that he believed APS would have minimal liability.  Likewise, Hunter testified that he was not told about the delinquent FICA tax obligations.  The evidence is clear that Brinson did not want the OmniPlex Settlement and FICA tax liabilities reflected in APS's financial statements and it appears Brinson intentionally misrepresented APS's financials to its accountant to prevent this disclosure.  Given Brinson made these misrepresentations to his external accountant, the Court concludes Brinson would have made the same misrepresentations to an inquirer.

Further, nothing on the face of the financial statements or APS's general ledger would have indicated these statements were incorrect to an inquirer.  In fact, Hunter reviewed those documents in April 2011 and found no inconsistences.  Hunter only discovered the OmniPlex Settlement after performing an audit.  The scope of an accounting audit far exceeds the scope of a reasonably diligent inquiry.  Though there may have been other ways of discovering the settlement, the Trustee did not offer any evidence demonstrating that a reasonably diligent inquiry would have discovered the liability.  For example, perhaps an inquirer could have discovered the settlement through a PACER search.  There is no evidence, however, that a reasonably diligent inquiry would have involved performing a PACER search.  The Court therefore concludes, based on the evidence, that a reasonably diligent inquiry would not have discovered the OmniPlex Settlement.[5]  Regarding the FICA taxes, the evidence showed, even if

---

[5] Furthermore, even if an inquiry would have discovered the OmniPlex Settlement, the financial statements showed adequate equity to offset the liability.  Moreover, at the time APS made the Transfer, the company had made all payments required under the settlement agreement.  If an inquirer knew of the OmniPlex Settlement, that knowledge alone would not have led him to believe APS was insolvent.

an inquirer were to directly ask the IRS about APS's liabilities, the IRS would have required

Brinson's consent to discuss the company's delinquent taxes.

Considering the evidence before it, the Court concludes a reasonably diligent inquiry

would not have discovered any additional information that would have indicated APS was

insolvent. The Court is faced with a situation where the person controlling APS's financial

reporting appears to have manipulated the documents to show better financials. It is true that the

financial statements were incorrect, but there were no facts or circumstances that would have led

an inquirer to discover these misstatements. Therefore, the Court must conclude that an inquirer

would not have believed APS was insolvent.

Ultimately, APS's relationship with Bank of America supports the Court's conclusion.

This is the rare case where a court does not have to merely imagine what a hypothetical inquirer

would have concluded about APS's solvency upon performing a diligent inquiry. In fact, Bank

of America at the time APS transferred funds to repay Rogich was actively performing due

diligence in connection with an $8 million line of credit. Bank of America's conclusion to lend

APS money is persuasive in determining what conclusions a business person would have made

after a reasonable inquiry. During the course of a few months, the bank had access to APS's

financials, employees, and its external accountant. Bank of America representatives even came

to APS's office for two or three days to inspect APS's financial records. The bank's due

diligence far exceeded the reasonably diligent inquiry expected of an inquirer in this case. After

concluding its review, the bank extended credit to APS. Although it is true that this loan had

guarantees that would have made Bank of America's due diligence different from the

"reasonable inquiry" required under this cause of action, the Court does not believe Bank of

America would have extend a multi-million dollar loan to a company the bank believed was insolvent.

## IV.    CONCLUSION

The Court concludes the Trustee met its burden in establishing APS was insolvent.  The Trustee, however, failed to show by a preponderance of the evidence that Rogich had reasonable cause to believe APS was insolvent.  Accordingly, the Court will enter a judgment in favor of Rogich, the Defendant.